EDWARD MARTINOVICH, State Bar No. 237844
emartinovich@leaderberkon.com
STEPHANIE L. GASE (*pro hac vice* pending)
sgase@leaderberkon.com
LEADER BERKON COLAO &
SILVERSTEIN LLP
550 South Hope Street, Suite 1850
Los Angeles, CA 90071
Telephone: (213) 234-1750
Facsimile:  (213) 234-1747

*Attorneys for Plaintiff*
*GP Asset Holdings, LLC*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GP ASSET HOLDINGS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>ROSSLAW, PLLC, and MATTHEW E. ROSS,<br><br>Defendants. | Civil Action No. 3:23-cv-02360-TWR-KSC<br><br>Hon. Todd W. Robinson<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION** |

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ........................................................................1

II.  STATEMENT OF FACTS .............................................................................4

   A.   GP Asset Holdings Enters Into An Escrow Agreement With RossLaw. ......4

   B.   RossLaw Repeatedly Breaches The Escrow Agreement. ...........................9

   C.   GP Asset Holdings Attempts to Resolve the Dispute With RossLaw, To No
   Avail. ....................................................................................................11

III.  ARGUMENT ........................................................................................16

   A.   The Standard For A Temporary Restraining Order And Preliminary
   Injunction...................................................................................................16

   B.   The Court Should Issue A Temporary Restraining Order. .........................17

      1.   GP Asset Holdings is likely to succeed on the merits of its claims. .......18

      2.   GP Asset Holdings will suffer irreparable harm if the court does not
      issue a temporary restraining order..................................................................24

      3.   The balance of equities favors granting GP Asset Holdings' request and a
      temporary restraining order is in the public interest.........................................27

   C.   GP Asset Holdings Also Satisfies The Standard For A Preliminary
   Injunction...................................................................................................29

IV.  CONCLUSION ............................................................................................30

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

# TABLE OF AUTHORITIES

Cases

*Alliance for the Wild Rockies v. Cottrell*, 623 F.3d 1127(9th Cir. 2011)...............28

*Aronoff v. Lenkin Co.*, 618 A.2d 669 (D.C. 1992) .............................................20, 24

*Axley v. Transamerica Title Ins. Co.*, 88 Cal. App. 3d 1 (1978)............................20

*Bernhart v. County of Los Angeles*, 339 F.3d 920 (9th Cir.2003) .........................17

*Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016) ...................28

*Caesar v. Westchester Corporation*, 280 A.3d 176 (D.C. 2022) ...........................23

*Cal. Pharmacists Ass'n Maxwell-Jolly*, 596 F.3d 1098 (9th Cir. 2010) ...............28

*Capital River Enterprises, LLC v. Abod*, 301 A.3d 1234 (D.C. 2023) .............23, 24

*Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810 (9th Cir. 2003)17

*Friends Christian High School v. Geneva Financial Consultants*, 39 F. Supp. 3d 58 (D.C. 2014)...........................................................................................23

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cit. 2015) ...........................................18

*George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F. Supp. 381 (S.D.N.Y. 1991)............................................................................................................20

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ...........................................27

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) .........................................................17

*McWilliams Ballard Inc. v. Broadway Management Co., Inc.*, 636 F.Supp.2d 1 (D.D.C. 2009)...................................................................................................24

*Premier Produce Co., Inc. v. Martinez*, 2023 WL 3568068 (S.D. Cal. Feb. 24, 2023)................................................................................................................17

*Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992) ......................................................27

*Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431 (9th Cir. 1984)..........................25

*SASA Inv. Holdings, LLC v. Chhatrala*, 2020 WL 819016 (S.D. Cal. Feb. 19,

- iii -

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2020)...........................................................................................................20

*Spaziani v. Millar*, 30 Cal. Rptr. 658 (1963) ...........................................................20

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832 (9th Cir. 2001)................................................................................................................17

*Tsintolas Realty Co. v. Mendez*, 984 A.2d 181 (D.C. 2009) ....................................19

*U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915 (E.D.N.Y. 1999) ..........................................................................................................26

*United Fire & Cas. Co. v. Coggeshall Const. Co.*, 1991 WL 169147 (C.D. Ill. June 28, 1991)....................................................................................................................25

*W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764 (M.D. La. 2018)..................26

*Wagman v. Lee*, 457 A.2d 401 (D.C. 1983) ......................................................23, 24

*Westfield Ins. Co. v. Rainey Contracting, LLC*, 179 F. Supp. 3d 798 (E.D. Tenn. 2016)..........................................................................................................................26

Other Authorities

Fed. R. Civ. P. 65...........................................................................................................17

**Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction**

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Plaintiff GP Asset Holdings, LLC ("GP Asset Holdings" or "Plaintiff") respectfully submits this Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction (the "Motion").

## I.      PRELIMINARY STATEMENT

Without the emergency relief requested herein, within a matter of days GP Asset Holdings will forever lose a surety that is protecting a $4.25 million deposit transferred to an escrow account managed by defendants RossLaw, PLLC ("RossLaw") and its principal, Matthew E. Ross ("Mr. Ross," and together with RossLaw, "Defendants"), in connection with a transaction that has never been closed. Accordingly, GP Asset Holdings seeks a temporary restraining order and preliminary injunction requiring Defendants to turn over the surety to GP Asset Holdings within one (1) business day so that GP Asset Holdings can deposit it before it expires on January 11, 2024, after which GP Asset Holdings, within three (3) business days of receipt and clearing of the funds from the surety, will deposit with the Court either the funds it obtained from the surety or a bond for the equivalent amount (the "Requested Relief") pending resolution of the parties' dispute.

More specifically, GP Asset Holdings and RossLaw entered into an Escrow Agreement pursuant to which GP Asset Holdings agreed to deposit over four million dollars with RossLaw based on an express understanding that the deposit was secured

by an irrevocable pay order in its favor (in the form of a surety from a specific bank) that would automatically be provided to GP Asset Holdings by RossLaw—without dispute or even a request for it to be sent—if the underlying investment transaction was not closed within 120 days.  It has been well over 120 days and no investment transaction has ever materialized, but RossLaw has refused to send the surety to GP Asset Holdings.  Instead, Defendants have made repeated representations, whether on their own behalf or on behalf of their client, non-party SC Endowment, Ltd. ("SC Endowment"), that GP Asset Holdings just needs to "hang in there" and "keep [their] eyes on the prize" and the transaction will close shortly.  After months of these representations, and despite numerous requests for proof of the purported surety, GP Asset Holdings learned in late October that the surety in RossLaw's possession was not as described in the Escrow Agreement and, in any event, the surety was set to expire on January 11, 2024.

Absent the Requested Relief allowing GP Asset Holdings to deposit the surety before it expires on January 11, 2014, GP Asset Holdings will suffer immediate and irreparable harm as it will permanently lose its bargained-for collateral that was specifically meant to protect its deposit with RossLaw.  Furthermore, any analysis of the likelihood of the success of GP Asset Holdings' underlying claims, strongly supports the granting of the Requested Relief.  As discussed more fully below, RossLaw (acting through Mr. Ross) has actively breached the Escrow Agreement, as

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

well as their fiduciary duties to GP Asset Holdings, by: (1) disbursing the Escrowed Funds without strictly complying with the instructions in the Escrow Agreement; (2) refusing to return the Escrowed Funds upon written demand as required by the Escrow Agreement; and (3) failing to send GP Asset Holdings the bargained-for collateral meant to protect GP Asset Holdings from any loss of the Escrowed Funds. Defendants cannot put forth any evidence to convincingly justify their conduct or counter the eminently clear terms of the Escrow Agreement.

The harm caused by Defendants' conduct cannot be remedied with simple money damages. The critical purpose of the surety, and by extension the Escrow Agreement, is to provide GP Asset Holdings with certain rights to *prejudgment* collateralization. But unless Defendants are ordered, through emergency relief, to immediately return the surety to GP Asset Holdings, the surety will expire on January 11, 2024, and GP Asset Holdings will forever lose its bargained-for rights. This constitutes immediate, irreparable harm to GP Asset Holdings, necessitating emergency relief.

The balance of equities and the public interest also weigh in favor of granting the Requested Relief. As stated, GP Asset Holdings seeks nothing more than to maintain the status quo (i.e., its ability to have easily liquidated collateral for its deposit). Defendants, in turn, will suffer no conceivable harm—GP Asset Holdings seeks only to require Defendants to do what they are already required to do under the

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Escrow Agreement.

For these reasons, all the relevant factors weigh in favor of granting the Requested Relief.   As such, the Court should grant GP Asset Holdings' request for a temporary restraining order and preliminary injunction.

## II.    STATEMENT OF FACTS

### A.    <u>GP Asset Holdings Enters Into An Escrow Agreement With RossLaw.</u>

In early January 2023, GP Asset Holdings was approached about a potential transaction wherein non-party SC Endowment would provide funding to assist GP Asset Holdings in growing its business.  *See* Loughran Aff., ¶ 2.  As part of that potential transaction, defendants Mr. Ross and RossLaw prepared a draft letter of commitment and escrow agreement on behalf of their client SC Endowment.  *Id.*

Under the proposed letter of commitment, SC Endowment committed to use its best efforts to invest $111,500,000 in GP Asset Holdings and that, within 120 days from when the letter of commitment was fully executed, those funds would be made available for GP Asset Holdings to draw down from.  *See id.* at ¶ 3.  The draft letter of commitment also proposed that GP Asset Holdings would make a fully refundable deposit of $4,240,000 into RossLaw's escrow account in order to assist SC Endowment to finalize its investment.  *Id.*  In order to alleviate concerns about the refundability and ability to collect its refundable deposit (after the money may have already been spent), the proposed letter of commitment included a provision that an escrow agent, RossLaw, would not disburse GP Asset Holdings' deposit until it had

- 4 -

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

first obtained physical possession of collateral for the deposit in the form of an irrevocable pay order in GP Asset Holdings favor by Banco BBVA Spain. *Id.* at ¶ 4. If SC Endowment was unable to settle the investment within 120 days, the Escrow Agent would automatically send the collateral (i.e., the Banco BBVA Spain surety) to GP Asset Holdings. Mr. Ross drafted the proposed escrow agreement, wherein his firm (a solo law firm) would act as the escrow agent, which contained similar language stating that GP Asset Holdings' $4,240,000 deposit would not be disbursed until, among other things, RossLaw had physical possession of the irrevocable pay order from Banco BBVA Spain for Four Million Five Hundred Thousand Euros (€4,500,000). *Id.* at ¶ 5-6. Then, if the investment was not settled within 120 days, RossLaw would automatically send the collateral (i.e., the Banco BBVA Spain surety) to GP Asset Holdings. *Id.*

Unsurprisingly, one of GP Asset Holdings' main concerns about Defendants' proposed agreements and the proposed transaction generally was protecting its refundable deposit to make sure it would be able to quickly and easily get a return of the full amount within 120 days without having to fight about it through litigation. *Id.* at ¶ 7. Accordingly, GP Asset Holdings' consultant, Krishen Iyer, emailed Mr. Ross and SC Endowment to determine what the worst-case scenario would be if the transaction did not close within 120 days and specifically asked how the surety would work given Section 1.3 of the proposed escrow agreement. *Id.* at ¶ 8, Ex. 1. SC

Endowment assured GP Asset Holdings that there would be no "fight" with respect to collecting on the surety as it was similar to "collecting a check" that GP Asset Holdings could deposit. *Id.* at ¶ 9, Ex. 1.

Mr. Ross also provided GP Asset Holdings with an attestation letter, dated January 9, 2023, to reassure GP Asset Holdings about the proposed transaction, confirming the surety was there to protect it in case the transaction did not close. *See* Loughran Aff., Ex. 2. Specifically, Mr. Ross explained that the "surety protects the down payment and reimburses the developer [i.e., GP Asset Holdings] should the bond not settle. *Id.* The surety is structured as a pay order made out to the party putting up the down payment and is held by me in trust to pay the down payment provider in the event the transaction does not close within 120 days." *Id.* Importantly, Mr. Ross, who drafted the proposed escrow agreement, was assuring GP Asset Holdings that under the escrow agreement, GP Asset Holdings would receive the surety if "the ***transaction*** does not close within 120 days." Mr. Ross further explicitly attested that the surety would be obtained from Banco BVBA Spain. *Id*.

Based on these representations, GP Asset Holdings entered into an Escrow Agreement with SC Endowment and RossLaw, effective January 9, 2023 (the "Escrow Agreement"), wherein RossLaw would act as Escrow Agent. *See* Loughran Aff., Ex. 3, ¶ 12. Pursuant to the terms of the Escrow Agreement, GP Asset Holdings

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

was required to transfer $4,240,000, less applicable fees, to RossLaw's Bank of America Maryland IOLTA Attorney Trust Account (the "Escrowed Funds") within ten business days. *Id.* at § 1.1.  RossLaw was then required to hold the Escrowed Funds in trust for GP Asset Holdings until such time as the specific requirements of Section 1.3 of the Escrow Agreement. *Id.* at § 1.2.

Importantly, the Escrow Agreement created three mandatory conditions that must be met before RossLaw could move any of the Escrowed Funds. *See* Loughran Aff., ¶ 15, Ex. 3. *First*, RossLaw had to obtain physical possession of a "Banco BBVA Spain surety in the form of an irrevocable pay order in the amount of Four Million Five Hundred Thousand Euros (€4,500,00) (the "BBVA Surety"). *Id.*, Ex. 3 at §1.3(B). To stress the importance of the BBVA Surety, as it was acting as GP Asset Holdings' collateral for its deposit, there was separate language written in all caps and bolded that stated:  "**FOR THE AVOIDANCE OF DOUBT, ESCROW AGENT MAY ONLY DISBURSE FUNDS ONCE IT HAS RECEIVED THE BANCO BBVA SURETY.**" *Id.* at §1.3. *Second*, RossLaw had to actually receive "a Notice of Readiness – Issuance and Formation of Private Corporate Bond email from Kendall Knowles attorney for TC Advantage Traders Ltd stating that the Financial Guarantee for the Bond is approved and that TC Advantage Traders will produce and sell the Bond to one of their authorized institutional buyers" (the "Notice of Readiness") and an "invoice from SC Endowment" (the "SC Endowment

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Invoice"). *Id.* at §1.3(B). *Third*, RossLaw had to submit a written disclosure to GP Asset Holdings via email attesting that RossLaw had received the BBVA Surety, the Notice of Readiness, and the SC Endowment Invoice. *Id.*

Given the importance of the collateral as a basis for transferring the Escrowed Funds, if RossLaw did not receive physical possession of the BBVA Surety within fifteen days of the receipt of the Escrowed Funds, GP Asset Holdings had "the right to have the Funds returned with no further obligation hereunder." *Id.* at § 1.3(B). This was further reiterated in Section 1.3(E), which stated: "In the unlikely event that the Surety does not arrive at the offices of the Escrow Agent, within fifteen (15) business days of the receipt by Escrow Agent of the Funds into the Escrow Account, [GP Asset Holdings] shall have the right to have the Funds immediately returned to [GP Asset Holdings'] bank of choice upon written notification by [GP Asset Holdings] to Escrow Agent." *Id.* at § 1.3(E).

If RossLaw disbursed the Escrow Funds, but SC Endowment was unable to produce to GP Asset Holdings a completed bond so that the transaction could close within 120 days, then RossLaw was required to send GP Asset Holdings the BBVA Surety via bonded FedEx carrier. *Id.*, at § 1.3(D) ("If the Bond is not produced within one hundred and twenty (120) days from the wire, the Escrow Agent shall send the Surety to [GP Asset Holdings'] address by bonded FedEx carrier to be collected by [GP Asset Holdings]."); Loughran Aff., Ex. 2 (First Attestation Letter) ("The surety

is structured as a pay order made out to the party putting up the down payment and is held by me in trust to pay the down payment provider **in the event the transaction does not close within 120 days**.") (emphasis added).

**B.     RossLaw Repeatedly Breaches The Escrow Agreement.**

After executing the Escrow Agreement and the Letter of Commitment and Term Sheet Regarding Funding and Credit Enhancement, with SC Endowment on January 9, 2023 (the "Letter of Commitment"), GP Asset Holdings caused the Escrowed Funds to be promptly transferred to RossLaw's Bank of America Maryland IOLTA Attorney Trust Account. *See* Loughran Aff., ¶ 14.   Although GP Asset Holdings had therefore performed its obligations under the Escrow Agreement, RossLaw almost immediately began to breach its obligations under the Escrow Agreement. *Id.* at ¶ 18.

In lieu of waiting until any of the three of the preconditions to disbursement of the Escrowed Funds had been met, Mr. Ross, on behalf of RossLaw, began disbursing the Escrowed Funds as of January 17, 2023.   As of January 17, however, none of the three preconditions had been fully satisfied.   For example, RossLaw had not received in its possession the BBVA Surety—nor has it ever received the BBVA Surety even as of today. *Id.* at ¶ 19.   Furthermore, RossLaw only obtained a purported Notice of Readiness that confirmed TC Advantage Traders Ltd was "***prepared*** to produce, monetize and sell the bond," and not a Notice of Readiness that confirmed TC

Advantage Traders "**will** produce and sell the Bond to one of their authorized institutional buyers." *See* Loughran Aff., Ex. 5 (Second Attestation Letter) (emphasis added); Loughran Aff., Ex. 3 (Escrow Agreement), at § 1.3(B) (emphasis added). Finally, RossLaw did not provide to GP Asset Holdings a written attestation that it had received the BBVA Surety and the Notice of Readiness that included the mandated language from the Escrow Agreement. *See* Loughran Aff., at ¶ 19.

After Defendants provided an attestation to GP Asset Holdings, which did not comply with the requirements of the Escrow Agreement, GP Asset Holdings repeatedly requested more information and proof that the requirements for disbursement were met, especially with respect to proof of the BBVA Surety's existence. Defendants, however, failed to provide any further information, often claiming such information was "confidential" and could not be disclosed. *Id.*

As the 120-day deadline under the Escrow Agreement approached, and the transaction appeared unlikely to timely close, GP Asset Holdings continued to push for additional information about the surety and what would happen if the transaction did not close. *Id.* at ¶ 20. In what was likely an effort by RossLaw to postpone a push for the immediate mailing of the surety, Mr. Ross sent GP Asset Holdings a letter on May 9, 2023, assuring them that, even though the closing date had to be pushed out beyond the 120-days in the agreements, the process would "be days, not weeks." *Id.* at ¶ 21, Ex. 6. One hundred and twenty days from RossLaw's receipt of

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

the Escrowed Funds passed in May 2023, yet RossLaw did not send GP Asset Holdings the surety even through no bond had been completed or settled and the transaction had not closed.   *Id.* at ¶ 22.

Believing Mr. Ross's promises, GP Asset Holdings did not immediately demand return of its deposit or the surety.  Weeks later, however, the transaction still had not closed and no completed bond had been produced.  Accordingly, GP Asset Holdings' counsel, David Emerzian, formally demanded, in writing, that Mr. Ross and RossLaw return the Escrowed Funds to GP Asset Holdings.  *See* Gase Decl., Ex. A.   Mr. Ross refused to return the Escrowed Funds (either by directly returning the Funds or by mailing the surety as required by the Escrow Agreement) and, instead, tried to argue that compliance with the 120-day deadline was not required because delays to closing were caused by GP Asset Holdings—even though the Escrow Agreement contained no provisions allowing an extension of the 120-day deadline unless by writing signed by GP Asset Holdings, SC Endowment, and RossLaw.  *See* Loughran Aff., Ex. 9.   Yet, at no time was the Escrow Agreement amended or modified to extend the initial 120-day period from when the Escrowed Funds were transferred to RossLaw.  *Id.* at ¶ 26.

## C.    GP Asset Holdings Attempts to Resolve the Dispute With RossLaw, To No Avail.

Based on representations by Mr. Ross and RossLaw regarding the status of the transaction (and the amended letter of commitment, executed June 15, 2023, that

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

increased the overall size of SC Endowment's investment to over $500,000,000 (the "Amended Letter of Commitment")), GP Asset Holdings did not further press RossLaw to return the Escrowed Funds or send the surety until it became closer to 120-days after the Amended Letter of Commitment was executed and the transaction had still not closed. *Id.* at ¶ 28-29.

On October 3, 2023, Mr. Emerzian, GP Asset Holdings' counsel, made a formal demand for proof of the surety from Mr. Ross and RossLaw. *See* Loughran Aff., Ex. 11. Although Mr. Ross indicated on October 5, 2023, that he would finally agree to send a redacted photo of the surety, he did not do so until October 20, 2023. *Id.* Ex. 11, Ex. 14, ¶ 42. Despite repeated requests for months for evidence the BVBA Surety existed, this was the first time that GP Asset Holdings was provided a copy or any specifics about the surety. *Id.* at ¶ 42.

Upon receipt of the photocopy of the surety, what GP Asset Holdings learned is that RossLaw had never obtained possession of the BBVA Surety, but had instead received a surety from another bank, Sabadell, even though the Escrow Agreement (and almost every other document GP Asset Holdings received) explicitly stated that the Escrowed Funds could not be disbursed until RossLaw obtained physical possessions of a surety from Banco BBVA Spain. *Id.*, Ex. 14.

When GP Asset Holdings or its counsel began to push for a return of the Escrowed Funds, or that the surety that RossLaw did have in its possession, both Mr.

Ross and SC Endowment repeatedly tried to postpone GP Asset Holdings from acting. GP Asset Holdings was repeatedly assured that the transaction would close imminently and that they should not be worried about the return of the Escrowed Funds. However, the alleged closing date continued to be pushed back by SC Endowment or Mr. Ross. *Id.* at ¶ 43.

On October 9, 2023, Mr. Emerzian made another demand for the return of the Escrowed Funds from RossLaw in the event that the transaction was not completed by November 1, 2023 (more than 120-days after the Amended Letter of Commitment). *Id.* at ¶ 30, Ex. 11. In response, Mr. Ross, for the very first time, alleged that GP Asset Holdings had somehow relinquished "all claim to return of the pay order." *Id.* (10.10.23 Ross Email). Mr. Ross's purported basis for this claim was an "acknowledgement of the ISIN and CUSIP numbers on April 8, 2023." *Id.* Although no acknowledgement of anything on April 8 actually exists, GP Asset Holdings anticipates that Mr. Ross is referring to a one-page document that SC Endowment sent to GP Asset Holdings on April 11, cc'ing Mr. Ross, for immediate signature by GP Asset Holdings. *See id.* at ¶ 33, Ex. 12 (Apr. 11 Email from SC). In its email, SC Endowment specifically told GP Asset Holdings that it needed to return the document signed "ASAP" and that it was "required for Insurance Coverage." *Id.* Given that SC Endowment represented that the document was insurance coverage and that it needed to be signed as soon as possible, Stacey Iyer signed the document

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

(even though it was inaccurate, as discussed below) and emailed it back to SC Endowment and Defendants within thirty minutes (the "Insurance Coverage Memo"). *Id* at ¶ 34-35, Ex. 12 (Apr. 11 Email from GP).

However, despite Mr. Ross's belated claim months later that this Insurance Coverage Memo somehow relinquished GP Asset Holdings' rights under the Escrow Agreement, no such effect was intended or valid. *Id.* at 36. Ms. Iyer signed the Insurance Coverage Memo, with Mr. Loughran witnessing it, not because they believed there was any binding, legal effect on GP Asset Holdings' contractual rights, but because SC Endowment said they needed the document, as drafted by SC Endowment, executed for insurance coverage purposes. *Id.* The Insurance Coverage Memo itself is not even signed by GP Asset Holdings, but instead relates to "GP Asset Holdings Group." *Id.* at ¶ 37. The Memo further states that GP Asset Holdings Group entered into a contract dated April 8, 2023, with SC Endowment, and received consideration for that contract on April 8. Certainly, no such contract exists between GP Asset Holdings and SC Endowment, nor did GP Asset Holdings receive any consideration for anything on April 8. *Id.* at ¶ 38. The Memo, again drafted by SC Endowment (and potentially Defendants), further inaccurately stated that SC Endowment provided "independent evidence of the creation of a Corporate MTN Bond in their favor." However, to date, GP Asset Holdings has never seen any evidence whatsoever that a bond was created in favor or GP Asset Holdings Group

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

or SC Endowment.  *Id.* at ¶ 39.   Nor was such a bond even contemplated by the Escrow Agreement, the Letter of Commitment, or the Amended Letter of Commitment, which all related to a bond in favor of TC Advantage Traders Ltd.  *Id.* at ¶ 40.

Accordingly, when it received Mr. Ross's communication on October 10, GP Asset Holdings was unclear what could possibly be Mr. Ross's justification for the Insurance Coverage Memo waiving GP Asset Holdings' rights under the Escrow Agreement.  *Id.* at ¶ 41.  This is especially true given that, as recently as December 15, 2023, Mr. Ross acknowledged that the bond had not closed.  *Id.*, Ex. 15 (12.15.23 Email) ("December 15 was never a realistic date.  And it was never being offered as a closing date.  Rather, it was the anticipated date of closing the bond upstream.  I told you a week ago that December 22 was far more likely.  We've slipped a couple of days since then, but I still think we can close by the end of this month.").

As the deadline for the expiration of the surety, which GP Asset Holdings learned from the photocopy of the surety was January 11, 2024, approached, GP Asset Holdings was forced to accept that the transaction was unlikely to ever close.  *Id.* at ¶ 44.  Accordingly, on December 21, 2023, Mr. Emerzian notified Defendants that if the surety was not placed in the mail by December 22, 2023, GP Asset Holdings would be filing an action in California against both Defendants the week of December 26, 2023, as well as seeking emergency relief for the turnover of the

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

surety. *See* Gase Decl., Ex. B.  Mr. Emerzian also requested that Defendants put their insurance carrier on notice of the potential claims, in part so they would be prepared for an application for emergency relief to be filed. *Id.*

GP Asset Holdings' litigation counsel notified Mr. Ross that GP Asset Holdings intended to imminently file this application on the morning of December 28, 2023. *See* Gase Decl., Ex. C.  Ms. Gase personally spoke with Mr. Ross on December 28 about the bases of GP Asset Holdings' claims and what preliminary injunctive relief it would be requesting.  During this conversation, the dispute was unable to be resolved and Ms. Gase gave notice that a hearing may occur as early as December 29, 2023, and that she would promptly notify Mr. Ross, or Defendants' counsel (if he had obtained counsel) of the date and time of any hearing. *Id.* at ¶¶ 5-6.

## III. ARGUMENT

### A. The Standard For A Temporary Restraining Order And Preliminary Injunction.

The Ninth Circuit uses two alternative tests to evaluate the propriety of a temporary restraining order or preliminary injunction.  Under the traditional test, a party must show (i) that it is likely to succeed on the merits; (ii) that it is likely to suffer irreparable harm in the absence of preliminary relief; (iii) that the balance of equities tips in favor of the movant; and (iv) that the public interest favors issuing the relief. *See Premier Produce Co., Inc. v. Martinez*, 2023 WL 3568068, at *1 (S.D.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Cal. Feb. 24, 2023); *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, n. 7 (9th Cir. 2001).  Fed. R. Civ. P. 65.  Alternatively, courts require the moving party to "demonstrate either (a) probable success on the merits combined with the possibility of irreparable injury or (b) that [the movant] has raised serious questions going to the merits, and that the balance of hardships tips sharply in her favor." *See Bernhart v. County of Los Angeles*, 339 F.3d 920, 925 (9th Cir.2003). These are not two separate tests, but rather two points on a sliding scale in which the required showing of harm varies inversely with the required showing of meritoriousness.  *See Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003).  Because a preliminary injunction is an extraordinary remedy, the movant must carry its burden of persuasion by a "clear showing." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

**B.**      **The Court Should Issue A Temporary Restraining Order.**

GP Asset Holdings easily prevails under either test for a temporary injunction. GP Asset Holdings has fully demonstrated its clear likelihood of success on both its breach of contract and breach of fiduciary duty claims against RossLaw and Mr. Ross.  Furthermore, absent the requested relief, GP Asset Holdings will suffer imminent and irreparable harm if its bargained-for collateral for its deposit of the Escrowed Funds is allowed to expire on January 11, 2024.  RossLaw, for its part, will face no prejudice if the Court forces it to specifically perform the obligations in the

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

- 17 -

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

Escrow Agreement.  Furthermore, given that GP Asset Holdings is willing to either fully deposit with the Court the money it receives from cashing the surety prior to its expiration or obtain a bond for the same amount, any potential harm to RossLaw is obviated and the balance of the equities and the public interest favors issuance of the temporary restraining order.

### 1.    GP Asset Holdings is likely to succeed on the merits of its claims.

Likelihood of success on the merits is "the most important" factor in determining whether to issue a temporary restraining order.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cit. 2015).  Here, there is no serious question that GP Asset Holdings is likely to succeed on its substantive claims: breach of contract and breach of fiduciary duty.

### a.  GP Asset Holdings is likely to succeed on its breach of contract claim.

GP Asset Holdings unequivocally demonstrates a right to relief under the express terms of the Escrow Agreement.  Indeed, as discussed in more detail below, RossLaw breached the Escrow Agreement by disbursing the Escrowed Funds without strictly complying with the instructions provided, refusing to return the Escrowed Funds upon written demand, and failing to send GP Asset Holdings the bargained-for collateral meant to protect GP Asset Holdings from any loss of the Escrowed Funds.

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

In order to prevail on a breach of contract claim under D.C. law,[1] a party must show: (i) a valid contract between the parties; (ii) an obligation or duty arising out of the contract; (iii) a breach of that duty; and (iv) damages caused by the breach. *See Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). Here, there can be no real dispute that the Escrow Agreement is a valid agreement executed by GP Asset Holdings, RossLaw, and SC Endowment. GP Asset Holdings further has abided by the terms of the Escrow Agreement by, among other things, depositing approximately $4.2 million into RossLaw's IOLTA account within the prescribed time.

RossLaw, on the other hand, has not complied with its contractual obligations. Under Section 1.3 of the Escrow Agreement, RossLaw was given specific instructions on the preconditions that must be met prior to disbursement of the Escrowed Funds. Mr. Ross, on RossLaw's behalf, nevertheless disbursed the Escrowed Funds from the IOLTA account before those preconditions had been met in breach of Section 1.3. Importantly, RossLaw disbursed the Escrowed Funds even though: (1) it had not obtained physical possession of the BBVA Surety; (2) had not received a Notice of Readiness that included a confirmation that TC Advantage Traders "will produce and sell" the bond to one of their institutional buyers; and (3) had not provided the written attestation to GP Asset Holdings that it had received the

---

[1] The Escrow Agreement is governed by the laws of the District of Columbia. *See* Loughran Aff., Ex. 3 (Escrow Agreement), at § 3.4.

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

BBVA Surety and a Notice of Readiness that included the language mandated by the Escrow Agreement.

Instead, without notice, authorization, or written amendment to the Escrow Agreement, Defendants unilaterally decided that they could ignore the specific instructions outlined in the Escrow Agreement so long as it took an action that RossLaw considered the equivalent of the specified instructions.  However, as a matter of law, an escrow agent must strictly comply with instructions provided in the escrow agreement and cannot make equivalency determinations on its own.  *See Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992) (quoting *Spaziani v. Millar*, 30 Cal. Rptr. 658, 666 (1963)) (noting the "duty of an escrow holder [is] to comply strictly with the instructions" in the escrow agreement); *SASA Inv. Holdings, LLC v. Chhatrala*, 2020 WL 819016, at *3 (S.D. Cal. Feb. 19, 2020) (quoting *Axley v. Transamerica Title Ins. Co.*, 88 Cal. App. 3d 1, 8 (1978)) ("The duty of an escrow holder is to comply strictly with the instructions" in the escrow agreement); *see also George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F. Supp. 381, 388 (S.D.N.Y. 1991) ("the parties to an escrow agreement [must] comply strictly with the terms and conditions thereof.").

Furthermore, even if RossLaw could unilaterally make determinations that certain actions were the equivalent of what was required pursuant to the escrow instructions without breaching the Escrow Agreement—it cannot—what RossLaw

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

did prior to disbursing the Escrowed Funds is not the equivalent of what was required under the instructions. For example, a Notice of Readiness that confirms TC Advantage Traders is "prepared to produce, monetize and sell the bond" is very different than a confirmation that TC Advantage Traders "will produce and sell the Bond to one of their authorized institutional buyers." Under no interpretation of the words can a company being *prepared to* sell something be the same thing as a confirmation that the company *will* sell something.

RossLaw independently breached Sections 1.3(B) and 1.3(E) when, even though it had not obtained physical possession of the BBVA Surety, it refused to return the Escrowed Funds to GP Asset Holdings after a written demand for their return. *See* Loughran Aff., Ex. 3 (Escrow Agreement), at § 1.3(B) (if RossLaw did not receive the BBVA Surety within fifteen business days, GP Asset Holdings had "the right to have the Funds returned with no further obligation hereunder"); id., at § 1.3(E) ("In the unlikely event that the Surety, [defined as the BBVA Surety] does not arrive at the offices of the Escrow Agent, within fifteen (15) business days of the receipt by Escrow Agent of the Funds into the Escrow Account, [GP Asset Holdings] shall have the right to have the Funds immediately returned to [GP Asset Holdings'] bank of choice upon written notification by [GP Asset Holdings] to [RossLaw].").

RossLaw additionally breached the Escrow Agreement when it failed to return GP Asset Holdings' bargained-for collateral (i.e. the surety) pursuant to the terms of

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

the Escrow Agreement.  Section 1.3(D) required RossLaw to automatically send the surety to GP Asset Holdings if more than 120-days had passed from receipt of the Escrowed Funds without the bond being completely settled.  *See* Loughran Aff., Ex. 3 (Escrow Agreement), at § 1.3(D); Loughran Aff., Ex. 2 (First Attestation Letter) ("The surety is structured as a pay order made out to the party putting up the down payment and is held by me in trust to pay the down payment provider in the event ***the transaction*** does not close within 120 days.") (emphasis added).[2]  As Mr. Ross acknowledged as recently as December 15, 2023—well after any interpretation of 120-days—no bond has closed.  *See* Loughran Decl., Ex. 15 ("December 15 . . . was the anticipated date of closing the bond upstream.").  Nor can RossLaw reasonably argue that the transaction has closed or a bond has been settled.  Nevertheless, despite repeated demands to do so, RossLaw has refused to send GP Asset Holdings the surety it obtained from Sabadell—a clear breach of the Escrow Agreement.

As a result of RossLaw's numerous breaches, GP Asset Holdings not only is being denied its prejudgment right to collateralization, but now risks losing its entire $4.2 million deposit.  It has also incurred out of pocket costs for continuing to

---

[2] *See also* Loughran Aff., Ex. 4 (Letter of Commitment) ("In the event that the investor is unable to ***settle*** the Corporate Bond within (120) days, the Surety can be called upon for face value within three hundred sixty (360) days.") (emphasis added); Loughran Aff., Ex. 10 (Amended Letter of Commitment) ("In the event that the investor is unable to ***settle*** the Corporate Bond within (120) days, the Surety can be called upon for face value within three hundred sixty (360) days.") (emphasis added).

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

maintain a line of credit for the $4.2 million deposit well past the initial 120-days when it should have been fully refunded the Escrowed Funds.   Under these circumstances, GP Asset Holdings has demonstrated a clear likelihood of success on the merits of its breach of contract claim.

      b.      *GP Asset Holdings is likely to succeed on its breach of fiduciary duty claim.*

GP Asset Holdings is also likely to succeed on its breach of fiduciary claim. To prevail on such a claim, a movant must show: (i) the existence of a fiduciary relationship between GP Asset Holdings and Defendants; (ii) breach of a duty imposed by that fiduciary relationship; and (iii) an injury caused by such breach.  *See Caesar v. Westchester Corporation*, 280 A.3d 176, 186 (D.C. 2022).  Under D.C. law, the escrow / depositor relationship establishes a fiduciary relationship between GP Asset Holdings and RossLaw independent of the Escrow Agreement.  *See Friends Christian High School v. Geneva Financial Consultants*, 39 F. Supp. 3d 58, 63 (D.C. 2014) ("the 'escrow/depositor relationship, regardless of contractual underpinnings' creates an 'independent fiduciary relationship between the parties'"); *Wagman v. Lee*, 457 A.2d 401, 404 (D.C. 1983) ("Notwithstanding any contractual obligations, appellant, as escrow agent, owed to appellee the duties of a fiduciary."); *Capital River Enterprises, LLC v. Abod*, 301 A.3d 1234, 1242 (D.C. 2023). Furthermore, Mr. Ross is liable for any breach of that fiduciary duty because he personally participated and committed the actions that form the basis of the breach

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

of fiduciary duty. *See McWilliams Ballard Inc. v. Broadway Management Co., Inc.*, 636 F.Supp.2d 1, 9 (D.D.C. 2009) ("Under D.C. law, corporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation.").

The fiduciary relationship between RossLaw and GP Asset Holdings imposes a duty of care on RossLaw to GP Asset Holdings, as well as a duty to act with good faith and candor towards GP Asset Holdings. *See, e.g.*, *Capital River Enterprises, LLC*, 301 A.3d 1234. Under D.C. law, it is well established that an escrow agent's disbursement of escrowed funds not in compliance with escrow instructions is a breach of the escrow agent's fiduciary duty. *See, e.g.*, *Wagman*, 457 A.2d at 404; *Aronoff*, 618 A.2d at 687. Accordingly, RossLaw's distribution of the Escrowed Funds prior to the preconditions for disbursement being met (*see* Section III(B)(1)(a) *supra*), as well as Mr. Ross's direct participation in the removal of the Escrowed Funds from RossLaw's account, is a clear breach of RossLaw's and Mr. Ross's fiduciary duty to GP Asset Holdings.

### 2. GP Asset Holdings will suffer irreparable harm if the court does not issue a temporary restraining order.

GP Asset Holdings will suffer immediate and irreparable harm if it is not allowed to draw down on the surety before it expires on January 11, 2024, because it would be denied enforcement of the collateralization provision that was specifically bargained-for by GP Asset Holdings. RossLaw was required to obtain physical

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

possession of a surety from Banco BVBA Spain to secure GP Asset Holdings' deposit prior to distribution of any of the Escrowed Funds.   RossLaw was then required to send the surety to GP Asset Holdings in the event SC Endowment failed to close the transaction within 120 days.  However, despite the transaction not closing within the 120-day period, RossLaw refuses to send the surety, which expires by its terms on January 11, 2023.   Thus, GP Asset Holdings is now at risk of losing its bargained-for security, and by extension, its entire deposit.

Specific performance is an available remedy in the event a collateral security clause is breached.  *See Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984).   GP Asset Holdings' ability to obtain the relief to which is it plainly entitled depends upon the surety remaining valid—but, as noted, the surety is set to expire in less than fourteen days.   As such, without the issuance of a temporary restraining order requiring RossLaw to turn over the surety for GP Asset Holdings to utilize (and then either deposit the cleared funds with the Court or obtain an equivalent bond), GP Asset Holdings will forfeit its ability to vindicate its bargained-for right to collateralization, and be left attempting to claw back its deposit without the security it specifically agreed to with RossLaw.  This constitutes immediate and irreparable harm that cannot be remedied with money damages.  *See, e.g.*, *United Fire & Cas. Co. v. Coggeshall Const. Co.*, 1991 WL 169147, at *2 (C.D. Ill. June 28, 1991) (Plaintiff Surety would be irreparable harmed by "depriving it of pre-

judgement to relief to which it is contractually entitled."); *Westfield Ins. Co. v. Rainey Contracting, LLC*, 179 F. Supp. 3d 798, 801 (E.D. Tenn. 2016) ("sureties suffer immediate, irreparable harm when denied their bargained for collateralization of anticipated liability"); *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 923 (E.D.N.Y. 1999) (the "breach of the collateral security clause will result in immediate harm since the Sureties risk being deprived of bargained-for collateral"); *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 793 (M.D. La. 2018) ("[w]hile plaintiff may be entitled to money damages in this matter, an award of damages after trial does not adequately vindicate the plaintiff's right to collateralization").

The threat of irreparable harm to GP Asset Holdings is not speculative nor hypothetical. GP Asset Holdings' bargained-for right to collateralization, in the form of the surety, is set to expire imminently—nothing apart from emergency relief can preserve GP Asset Holdings' rights.

In addition, GP Asset Holdings will experience irreparable harm in the absence of emergency relief because the assets that are the subject of this litigation are likely to be imminently dissipated because of the expiration of the surety. The Escrow Agreement identifies specific and concrete assets—a Banco BBVA Spain surety (which Defendants failed to obtain and, instead, improperly obtained from a different bank without written permission from GP Asset Holdings)— that must be delivered

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

to GP Asset Holdings in the event the transaction does not close within 120 days. An injunction is necessary to ensure that those assets are available for recovery in the event GP Asset Holdings is successful on its underlying claims. Otherwise, GP Asset Holdings, by virtue of an expired surety, cannot possibly receive the benefit of the bargain to which it is entitled. *See Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521, 1526 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992) (issuing injunction where "the assets sought to be frozen are part of the subject of the action"); *see also Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) ("a likelihood that defendants will not have the resources to reimburse" the plaintiff weighs in favor of a finding of irreparable harm).

### 3. The balance of equities favors granting GP Asset Holdings' request and a temporary restraining order is in the public interest.

As described above, the harm that GP Asset Holdings will suffer in the absence of emergency relief is self-evident: allowing RossLaw to continue retaining the surety in violation of the Escrow Agreement—even as the surety is set to expire—will permanently deny GP Asset Holdings its bargained-for right to prejudgment collateralization. RossLaw, on the other hand, will suffer no prejudice whatsoever. Indeed, all GP Asset Holdings requests of this Court is an order requiring RossLaw to do *what it is already required to do* under the Escrow Agreement. Any claim that RossLaw will be harmed by doing what it already contractually agreed to do is nothing more than a specious attempt to nullify a legally enforceable agreement. A

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

request to merely maintain the status quo while the litigation proceeds cannot, almost by definition, constitute harm to RossLaw, especially where the result is mandated by a valid agreement between the parties. *See Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1023 (9th Cir. 2016) (Defendants "have not established how maintaining the status quo while the district court decides the case on the merits will injure them."). Here, the status quo that is meant to be maintained is GP Asset Holdings' ability to obtain prejudgment collateral.

Because the requested relief is incredibly narrow—directed only at requiring one party to comply with a validly entered contract—the public interest analysis is neutral for purposes of issuing a temporary restraining order. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009) ("When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will 'at most a neutral factor in the analysis…'") (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003)). Even so, RossLaw cannot identify any public interest that would be harmed by merely requiring RossLaw to observe the terms of the Escrow Agreement and maintain the status quo while this litigation proceeds. *See Alliance for the Wild Rockies v. Cottrell*, 623 F.3d 1127, 1138 (9th Cir. 2011) (quoting *Cal. Pharmacists Ass'n Maxwell-Jolly*, 596 F.3d 1098, 1114-15 (9th Cir. 2010)) ("the public interest analysis … requires us to consider whether there exists some critical public interest that would be injured by the grant of preliminary

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

relief.").

Thus, because denying the requested relief will deny GP Asset Holdings its bargained-for right to collateralization and induce no conceivable harm on RossLaw, the balance of equities and the public interest weigh in favor of GP Asset Holdings.

## C. GP Asset Holdings Also Satisfies The Standard For A Preliminary Injunction.

Here, the Court should issue a preliminary injunction for the same reasons that a temporary restraining order is appropriate. Indeed, the timing of the determination does not change the underlying justification for an injunction in this case. First, GP Asset Holdings' likelihood of success on the merits is self-evident for the reasons discussed above, and no further inquiry is required by this Court. Second, the irreparable harm to GP Asset Holdings can only be prevented if an injunction remains in place *throughout* the litigation. In other words, the funds from the surety (or an equivalent bond) should remain with the Court during the course of the litigation. It would defy reason to require RossLaw to post collateral with this Court only temporarily, merely delaying the strong likelihood that GP Asset Holdings' bargained-for right to prejudgment collateralization will be lost. Finally, the balance of equities and the public interest analysis is the same regardless of timing; whether in place temporarily or for the duration of the litigation, the requested injunction would do nothing more than command RossLaw to do what it is already contractually required to do, and thus would cause no conceivable harm.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

In sum, GP Asset Holdings satisfies the standard for a preliminary injunction for the same reasons it is entitled to a temporary restraining order, and the Court should issue the requested relief for the duration of the litigation.

## IV.   CONCLUSION

For the forgoing reasons, the Court should grant GP Asset Holdings' request for a temporary restraining order and preliminary injunction requiring Defendants to immediately turnover to GP Asset Holdings within one (1) business day the surety from Sabadell; allowing GP Asset Holdings to deposit the surety from Sabadell; and then requiring GP Asset Holdings, within three (3) business days of receipt and clearing of the funds from Sabadell, to deposit with the Court either the funds it obtained from the surety or a bond for the equivalent amount.

Dated: December 29, 2023          LEADER  BERKON  COLAO  &  SILVERSTEIN LLP


By: */s/ Edward Martinovich*
    Edward Martinovich
    Stephanie L. Gase (*pro hac vice* pending)

    *Attorneys for Plaintiff*
    *GP Asset Holdings, LLC*